[Cite as *Matt Pool, Ltd. v. Sandusky Hous. Appeals Bd.*, 2024-Ohio-4724.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

Matt Pool, LTD

      Appellant

v.

City of Sandusky Housing
Appeals Board

      Appellee

Court of Appeals No.  E-23-040

Trial Court No. 2021 CV 430


**DECISION AND JUDGMENT**

Decided: September 27, 2024

* * * * *

Arleesha Wilson, for appellant.
.
Stewart Hastings, City of Sandusky Law
Director and Sarah S. Chiappone for appellee.

* * * * *

**ZMUDA, J.**

{¶ 1} Appellant, Matt Pool, Ltd., appeals the June 6, 2023 decision of the Erie
County Common Pleas Court affirming appellee Sandusky Housing Appeals Board's
demolition order.  For the following reasons, we affirm the trial court's judgment.

**I.  Facts and Procedural Background**

{¶ 2} Appellant is a company owned by Floyd and Gail Matthews.  It is the titled
owner of the property at issue, 1528 Columbus Avenue in Sandusky, Ohio (the property).

In March 2021, the city of Sandusky (city) issued an order for the demolition of one of the buildings on the property. Pursuant to Sandusky Codified Ordinance Chapter 1341, appellant appealed the order with appellee, and appellee considered appellant's appeal at four of its meetings. In October 2021, appellee affirmed the demolition order, and appellant appealed appellee's decision to the Erie County Common Pleas Court. On June 6, 2023, the court affirmed appellee's decision. Appellant filed a timely appeal of that decision in this court.

{¶ 3} The following contains a summary of the facts as developed in the administrative record as well as a summary of the proceedings in the common pleas court appeal.

## A. The Property's History

{¶ 4} Appellant has owned the property for approximately 20 years. The property contains two buildings: a front building, which was originally a single-family residence converted into a multi-family residence, and a rear building, also converted into a multi-unit residential building. The issue in this appeal pertains to the front building.

{¶ 5} The buildings on the property have had numerous code violations since at least 2011, including damaged or rotting siding, peeling or flaking paint, and roof issues. In 2011, city officials informed appellant about lead abatement programs. The appellant told city officials that lead abatement would begin in 2014, but the record contains no evidence that appellant initiated any lead abatement at that time. The record shows numerous notices of violations sent to appellant and several failed inspections spanning

2.

the period from 2011 to 2021, many of which concerned lead issues. As early as 2016, city building officials discussed whether the building needed to be demolished.

{¶ 6} In 2019, the Erie County Health Department was notified that a child developed lead poisoning due to lead exposure at the property. In January 2020, two inspectors from the city were assigned the case. The city issued appellant a first and second penalty, and appellant paid the penalties. In February 2021, the dog warden sent pictures of the building's interior to city building officials after responding to an issue with the property's tenants.

## B. The March 2021 Inspection & Demolition Order

{¶ 7} On March 4, 2021, Scott Thom, the city's chief building official, inspected the property pursuant to a warrant obtained following the dog warden's visit. During the March 2021 inspection, Thom inspected both the front and rear buildings. At the time of the March 2021 inspection, the front building had just two units, an upstairs unit and a downstairs unit. The downstairs unit was vacant, and the upstairs unit was occupied by tenants. Thom later described the conditions upstairs at the time of his March 2021 inspection as "deplorable." The Ohio Department of Health issued an order to vacate on March 15, 2021, and the tenants in the upstairs unit finally vacated the property.

{¶ 8} Thom determined, based on his March 2021 inspection, that the front building was 59% deteriorated. Accordingly, the city issued an order for the demolition of the front building on April 27, 2021.

3.

## C. The Appeal of the Demolition Order

{¶ 9} On May 6, 2021, appellant appealed the demolition order, explaining that the property "has been substantially rehabilitated over 50% of its original value and/or substance." Appellant specifically noted that running water had been restored to the property, the bathroom floor and subfloor and had been removed and replaced, toilets were replaced, the kitchen had been gutted, and the interior had been repainted and cleaned.

{¶ 10} On June 30, 2021, appellee sent appellant a notice that it would hold an adjudication hearing regarding his appeal at its meeting scheduled for July 27, 2021. The notice contained the following instruction:

> It is highly recommended that you bring evidence such as contractor/engineering reports, a comprehensive repair plan with a timeline for completion, cost estimates and financial ability to complete the proposed repairs, and any other information in support of your appeal.

### 1. July 27, 2021 Meeting

{¶ 11} The appeal was first heard at appellee's July 27, 2021 meeting. At the meeting were appellant's owners, Floyd and Gail Matthews, represented by their counsel, Mark Smith, as well as several city building and code officials.

{¶ 12} Dante Shipp, who worked for the city as a code inspector, testified first. Shipp provided background information regarding the property as well as updates regarding work that appellant had begun following the March 2021 inspection. Shipp testified that a second inspection of the property was conducted on April 22, 2021, and the inspectors observed that appellant had made several repairs. Photos from April 2021

4.

were submitted showing repairs to the upstairs, including new flooring, repair of a hole in the floor, and a repaired front porch. Shipp also explained that the upstairs unit had been divided into two units after the March inspection. Although Shipp testified that appellant had been complying with the city's requests, the property continued to need significant repairs.

{¶ 13} Scott Thom, the city's chief building official, also testified at the meeting. He said that the first-floor unit was nearly completed gutted with no flooring whatsoever and plaster was missing in several rooms due to a water leak from the upstairs unit that flooded the first floor. Further, because the first-floor walls had been opened up, Thom testified that appellant would need to bring the building's electrical up to code, and that appellant should also update the plumbing and HVAC systems. Thom noted that one side of the building was in very poor shape and was probably an illegal addition. Thom also said that the stairs to the upstairs unit were unsafe and previous work to the roof had been done incorrectly, causing water intrusion and likely rotted material. Thom emphasized that any electrical, mechanical, framing, and roofing work must be performed by a registered contractor.

{¶ 14} As to the lead abatement, Shipp noted that a letter from the Erie County Health Department dated July 27, 2021 had been submitted to appellee. The letter, which was part of the administrative record, stated that the lead abatement would cost $20,000. The property owner was eligible to apply for a grant through the health department to pay for the abatement, but the grant required a 10% match with a maximum amount of

5.

$20,000. Mr. Matthews protested, claiming that he was entitled to additional grant money because he had converted the front building from two units to three units. Shipp agreed, explaining that the additional grant money was the reason appellant added the third unit. Shipp testified that the health department would not start work until the lower unit was cleaned out, and the health department needed 90 days to determine how much the abatement would cost.

{¶ 15} Dick Brady, the president of City Commission, also testified. Brady said that he had received letters supporting the demolition of the property from several owners of nearby properties, copies of which he provided to appellee, and he had spoken to residents of the neighborhood. Brady testified that the neighbors complained that the property had been in poor condition for several years and negatively impacted the quality of the neighborhood.

{¶ 16} Floyd Matthews also testified. Mr. Matthews explained that the tenants in the upstairs unit had destroyed the unit, and he could not evict them due to Covid eviction moratoriums until two days before the March inspection. Appellant's attorney, Mark Smith, emphasized that the tenants had refused to allow appellant into the unit at all—even to inspect the unit—despite a provision in the lease permitting landlord inspections, and any legal recourse available to appellant was extremely limited. After the tenants finally left, Mr. Matthews installed a new kitchen and painted the upstairs unit. Mr. Matthews said that he was doing the work himself because he did not know that a registered contractor was required, and most of the outstanding work was cosmetic. Mr.

6.

Matthews estimated that it would cost between $10,000 to $15,000 to get the work done. When questioned whether he had the financial means to pay for the repairs, Mr. Matthews agreed to provide proof.

{¶ 17} In part due to Mr. Matthews's explanation regarding the destructive tenants in the upstairs unit, appellee voted to give appellant an extension on his appeal, requiring appellant to complete the following tasks by appellee's meeting scheduled for the next month: (1) agree to a comprehensive rehabilitation plan set up by the city building department; (2) get the city building department's approval for any repairs before making the repairs; (3) provide appellee with total cost estimates for the entire project; (4) bring the house into compliance with the residential code of the Ohio building code; (5) provide the city inspector an opportunity to periodically come onto the property to perform an inspection and report back to the housing appeals board; and (6) clean the bottom unit out within a couple of weeks of the meeting's date. Appellant agreed to meet all of these conditions.

**2. August 31, 2021**

{¶ 18} At appellee's next meeting, on August 31, 2021, Mr. and Mrs. Matthews again appeared with Smith, their attorney. Again, several city building and code officials also testified regarding the property.

{¶ 19} Shipp testified that the property was reinspected on August 18, 2021. At that time, the bottom unit was cleaned out and the health department assessment had not yet been completed. Shipp explained that the health department's assessment had been

7.

delayed because the property owner had to provide proof of insurance before the health department would proceed. Appellant provided proof of insurance, and the health department planned to inspect the property the following week. Shipp testified that health department officials said that the assessment and the lead abatement would be completed within 60 to 90 days of the health department's inspection.

{¶ 20} John Orzech, the assistant city manager, also testified. Orzech stated that he had the responsibility of overseeing building and code, and he testified that the property had been out of compliance with code for approximately 10 years. He testified that there had been "quite a bit of controversy" in the neighborhood about the property. Orzech also testified that appellant had failed to submit any plans, documentation, or quotes from contractors on any of the mechanicals as required by appellee at the July 27, 2021 hearing. Appellant also had not submitted documentation of its ability to pay for the work. Orzech also noted that both Thom and George Poulos, another city building official, inspected the property earlier on the day of the meeting, and they had observed extensive issues with the outside stairwell that needed addressed by a professional before any other rehabilitation could take place.

{¶ 21} Shipp concurred, testifying that the staircase to the second-floor units needed another inspection, and the staircase was unusable, making the upper units uninhabitable.

{¶ 22} Mr. Matthews also testified that he misunderstood the conclusion of the last meeting. He thought the building inspector would give him a list of issues to correct and

8.

then Mr. Matthews was supposed to get quotes. Mr. Matthews also denied that the issues with the property had existed for 10 years, claiming that they had only arisen with the last tenants, who had lived at the property less than 10 years. Mr. Matthews emphasized that he had been working diligently to get his property back into compliance, and that he had waited for the past 30 days for the city to provide him with a list of issues.

{¶ 23} After some debate, appellee voted that the building department and code department was required to inspect to the property, make a list of all items that needed to be fixed, and provide the list to appellant and appellant's attorney. Using that list, appellant was required to submit a comprehensive rehabilitation plan to appellee by the following month's meeting, which was scheduled for September 28, 2021.

### 3. September 28, 2021

{¶ 24} At appellee's September 28, 2021 meeting, Mr. and Mrs. Matthews again appeared on behalf of appellant along with attorney Smith. Steve Rucker, the city's Housing Manager, testified along with Thom on behalf of the city.

{¶ 25} Rucker testified that on September 2, 2021, the building department and electrical, plumbing, building, and code inspectors met at the property for an inspection and wrote up all the code violations for the front building. Mr. Matthews was given a copy of all the violations. The document listed each violated code section, provided a link to an online version of the code, and grouped the code violations by category, such as exterior, stairway, and firewall separations between units and floors. The document also included several of the inspectors' observations of issues, including overloaded

9.

electrical panels, incorrect grounding, hanging wires, missing junction boxes, melting and overheating outlets, and severely deteriorating asbestos insulation on piping, as well as missing fixture covers and smoke detectors. The document also contained a note that no electrical permits had been pulled since 1993 and cautioned appellant that permits were required. Mr. Matthews was instructed to have a design professional explain how to correct the violations.

{¶ 26} Rucker also testified that on September 17, Mr. Matthews and Robert England, an official with the health department, discussed the violations that needed to be corrected before the lead assessment could be done. Rucker further testified that on September 23, Mr. Matthews was told he could meet with all the lead contractors, go through the violations list and risk assessments to determine what needed to be done before, during, and after lead remediation.

{¶ 27} Mr. Matthews testified that he had called many contractors and could not get any of them to show up or provide written estimates. Mr. Matthews expressed frustration with Thom, claiming Thom just wanted the building to be demolished and alleging that Thom was not providing him with sufficient information or assistance to prevent demolition. Mr. Matthews explained, "He got something personal against me I feel or maybe he just don't like Black people."

{¶ 28} Appellant's attorney pointed out that the list provided to Mr. Matthews included a a long list of repairs to make. He argued that the property should not have to be brought completely up to code due to grandfathering provisions in the code, and

10.

instead appellant should only have to correct serious health hazards. Appellant's attorney and Thom then began discussing which violations were serious health hazards. Appellee curtailed this discussion, stating that this discussion should have occurred before the meeting and pointing out that Mr. Matthews could have contacted the city's code enforcement department or Thom to get specifics about what would constitute a hazard.

{¶ 29} Finally, appellee's members again brought up appellant's failure to provide documentation evidencing its means to fund the repairs. Mr. Matthews protested that no firm agreement yet existed about exactly which repairs appellant was required to make. Appellant's attorney said that the appellants needed a specific number to take to the bank for pre-approval.

{¶ 30} Appellee directed appellant to consult with contractors to create a comprehensive plan for repairing the building as well as to get cost estimates for the repairs. Appellee also directed appellant to provide financial documentation to evidence its ability to pay for the lead abatement and the repairs in the comprehensive plan. Appellee voted to require appellant to provide both the plan and the financial information before the board's next meeting in 30 days.

### 4. October 26, 2021

{¶ 31} The final meeting of appellee concerning appellant's property occurred on October 26, 2021. Again, Mr. and Mrs. Matthews and their attorney appeared on behalf of appellant. Before the meeting began, appellant submitted the following: (1) a bank statement in Mr. Matthews's name documenting a $40,000 balance in the account; (2) a

11.

basic architectural drawing for the stairs; (3) a contractor's quote for $3,300 to complete the work on the stairs; and (4) a quote from an electrician for $2,359 to perform electrical work.

{¶ 32} At the meeting, appellant's attorney said that he still had no estimate as to when the lead abatement would occur because certain things needed to be completed before the health department would work on the property. Thom testified that Mr. Matthews was supposed to talk to the lead abatement contractors to determine what work needed completed before the abatement and what had to wait until afterward. Thom claimed there was no evidence Mr. Matthews had done so. Thom testified that at minimum, the stairs needed addressed and the building must have a working bathroom before abatement could start.

{¶ 33} Appellant's attorney also said that the plumbing work had been completed by a certified contractor. Thom pointed out that appellant had not obtained a permit for plumbing work. The city law director explained that the ultimate responsibility for pulling a permit rested with the property owner, not the contractor.

{¶ 34} Appellant also had not scheduled inspections of the work. Thom testified that he had not been invited to conduct any inspections, and he asserted that he could not inspect property without an invitation from the property owner. Rucker testified that building code inspectors had not been to the property for any inspections since appellee's previous meeting.

12.

{¶ 35} Three neighbors testified regarding the property's condition. Two of the three complained about the property, testifying that the property had been in disrepair for many years and was a blight on the neighborhood, with one neighbor describing broken windows, peeling paint, broken gutters, soffit damage, and an unfinished porch. The third neighbor said that other nearby properties had "cluttered" yards and she had seen Mr. Matthews or others frequently working on his property, so she believed Mr. Matthews was being harassed.

{¶ 36} Both Mr. and Mrs. Matthews testified regarding the property's condition. Mr. Matthews testified that the interior work was nearly complete, and the exterior disrepair could not be corrected until lead abatement was performed. Mrs. Matthews testified that the property was typically in good repair. In support, she pointed out that Metro Housing had rented the property many times.

{¶ 37} At the conclusion of the testimony, the board voted to affirm the demolition order. In making its decision, appellee discussed appellant's repeated failure to provide a comprehensive rehabilitation plan approved by the city housing official in a timely manner. Even though appellant had submitted proposals for some of the work, those proposals did not constitute a comprehensive plan with timelines. Moreover, appellant failed to have the plan approved by the city first, and appellant also failed to obtain a permit for the work that had been done. Accordingly, despite many extensions, appellant had not met appellee's requirements, and appellee voted to affirm the demolition order.

13.

## D. Common Pleas Appeal

{¶ 38} Appellant filed a notice of appeal in Erie County Common Pleas Court on November 4, 2021, attaching the November 1, 2021 demolition order.

{¶ 39} Appellant asserted four assignments of error.[1] First, appellant argued that the city's and board's actions were procedurally deficient. Appellant claimed the city failed to inspect the property before the property was ordered demolished, and appellant did not receive notice identifying which violations needed corrected and providing specific instructions regarding the comprehensive rehabilitation plan until shortly before appellee voted to affirm the demolition order.

{¶ 40} Second, appellant contended that the order violated appellant's due process rights under the U.S. and Ohio Constitutions. Appellant alleged that appellee did not provide sufficient specificity as to the violations that needed correcting, nor did appellee give appellant sufficient time to cure the violations.

{¶ 41} Third, appellant argued that appellee's decision was arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence. In support, appellant claimed that appellee did not make findings to support the order and the violations that actually needed correcting were never specifically identified. Even the exhaustive list of all the violations was not provided to appellant

---

[1] Appellant initially was pro se in the common pleas appeal, and the parties submitted briefs regarding the appeal. Subsequently, appellant's current counsel entered a notice of appearance, and the common pleas court ordered the parties to submit new briefs. The summary of the argument that follows are from appellant's second round of briefs, which were filed by appellant's counsel and to which appellee did not object.

14.

until September 2, 2021, less than two months before appellee voted to demolish the property.  Further, appellant argued that appellee's requirements for appellant to avoid demolition shifted throughout the appeals process.

{¶ 42} Finally, appellant asserted an additional argument on appeal in the trial court—that its property had been treated differently because of Mr. and Mrs. Matthews' race.  Appellant pointed to two properties near the property at issue with "lead-based issues" whose owners appellant claimed were white.  Appellant contended that these properties were not subjected to the same level of scrutiny as its property.

{¶ 43} In response, appellee argued that the city and board followed all relevant procedures.  According to appellee, Sandusky ordinances give the city's housing code officials authority to inspect buildings, appellant received several notices of violation, Thom inspected the building before finding the building to be over 50% deteriorated, city officials inspected the building numerous times during the administrative appeals process, and the city provided appellant with a "courtesy list" of each violation to take to a registered contractor.

{¶ 44} Pointing to the above notices of violations as well as the courtesy list, appellee also argued that appellant's due process rights had not been violated.  In addition, appellee pointed to the four separate meetings it held on the demolition order.

{¶ 45} Finally, appellee argued there was no evidence to support appellant's equal protection claim.  Appellee contended that appellant's statements regarding the other two

15.

properties were outside the record, and even if they were not, appellant had not established that the other two properties were more than 50% deteriorated.

{¶ 46} On June 6, 2023, the Erie County Common Pleas Court affirmed the demolition order, finding that appellee's "decision was supported [by] a preponderance of substantial, reliable, and probative evidence."

## II. Assignments of Error

{¶ 47} Appellant asserts the following assignments of error for our review:

1. The trial court erred in upholding the board's decision to affirm a demolition order for the property because the city of Sandusky lacked sufficient notice of violation and it failed to provide a reasonable time for appellant to comply as the city of Sandusky's codified ordinance requires.

2. The trial court erred in upholding the board's decision to affirm a demolition order for the property because the city of Sandusky failed to inspect the property prior to issuing the demolition order.

3. The trial court erred in upholding the board's decision to affirm a demolition order for the property because the demolition of appellant's property it deprives appellant of its property without due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution and § 10, Article 1 of the Ohio Constitution.

4. The trial court erred in upholding the board's decision to affirm a demolition order for the property because the demolition of appellant's property it deprives appellant of its right to equal protection as guaranteed by the Fourteenth Amendment of the United States Constitution and the Ohio Constitution.

### III. Law and Analysis

**{¶ 48}** Orders of administrative bodies, such as the Sandusky Board of Housing Appeals, may be appealed in common pleas court pursuant to R.C. chapter 2506. *OMNI Property Cos. v. Sylvania Twp. Bd. of Zoning Appeals*, 2022-Ohio-3083, ¶ 27 (6th Dist.). R.C. 2506.04 provides that the common pleas court considers whether the decision is "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record." In reviewing an administrative decision, "the common pleas court begins with the presumption that the board's decision is valid; the appealing party has the burden to demonstrate otherwise." *OMNI Property* at ¶ 28 (6th Dist.). The common pleas court "should not substitute its judgment for that of an administrative board, such as the board of zoning appeals, unless the court finds that there is not a preponderance of reliable, probative and substantial evidence to support the board's decision." *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 2014-Ohio-4809, ¶ 23, quoting *Kisil v. Sandusky*, 12 Ohio St.3d 30, 34 (1984).

**{¶ 49}** The judgment of the common pleas court may then be appealed to the court of appeals. The appellate court's standard of review "is narrower and more deferential to the lower court's decision" than the standard of review for common pleas courts. *Cleveland Clinic* at ¶ 25. Notably, the court of appeal reviews the decision of the common pleas court, not the decision of the administrative body. *Id*. at 27. In its review, the court of appeals is restricted to considering only questions of law and may not weigh

17.

the evidence. *Henley v. Youngstown Bd. of Zoning Appeals*, 90 Ohio St.3d 142, 147 (2000), quoting *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 261 (1988). The Ohio Supreme Court has emphasized the limited scope of an appellate court's review of an administrative decision as follows:

> The fact that the court of appeals, or this court, might have arrived at a different conclusion than the administrative agency is immaterial. Appellate courts must not substitute their judgment for those of an administrative agency or a trial court absent the approved criteria for doing so.

*Id*. Accordingly, "[t]he court of appeals must affirm unless it finds, as a matter of law, that the trial court's decision is not supported by a preponderance of reliable, probative, and substantial evidence." *OMNI Property* at ¶ 29.

## A. Arbitrary, Capricious, Unreasonable, or Unsupported by the Record

{¶ 50} Because appellant's first and second assignments of error overlap as they are based on the same allegations, we shall address them together. Appellant claims that appellee failed to give appellant notice of the specific violations that needed corrected and sufficient time to correct the violations to prevent demolition of the building. Appellant argues that the city and appellee were both required to provide such notice before a demolition order could be issued. Appellant specifically points to Sandusky Codified Ordinance 1341.04(a)(2), which provides that a notice of violation must "include a list of violations, refer to the sections and divisions violated and order remedial action." Appellant further argues, without citation to any legal authority, that the notice was required to be written in such a way that a layperson could understand

18.

which repairs needed completed without the aid of a professional. Appellant also claims that the city issued the demolition order without inspecting the entire front building, pointing to the references to Thom's inspection of two units in March 2021. Notably, appellant does not controvert the city's finding that the building was 59% deteriorated. Instead, appellant's first two assignments of error are focused on whether appellee followed the appropriate procedures to give appellant a reasonable opportunity to repair the building and prevent demolition.

{¶ 51} Appellee argues that in addition to the April 2021 demolition order and several previous notices of violation from as far back as 2011, appellant received a comprehensive list of violations with references to the sections and divisions violated on September 6, 2021. Further, appellee repeatedly instructed appellant to create a comprehensive repair plan with a registered contractor for the city to approve, a requirement that was discussed at four of appellee's meetings during which appellant had the opportunity to present evidence and make arguments. Nonetheless, at the October 26, 2021 meeting—six months after the demolition order was issued—appellant still had not submitted a timeline or a comprehensive plan for the repairs, had not obtained permits for the completed work, and had not coordinated the lead abatement process. Finally, appellee argues that Thom inspected the entire building in March 2021 and found it 59% deteriorated before the demolition order was issued.

{¶ 52} We agree with appellee that many of appellant's contentions are unsupported or entirely contradicted by the administrative record. Appellant's allegation

19.

regarding the incomplete inspection appears to be based on Shipp's statement at the July 2021 meeting that two units were inspected during the March 2021 inspection. However, the record also contains evidence that at the time of the March 2021 inspection, the front building contained only two units, an upstairs unit and a downstairs unit. According to the record, the third unit was added when Mr. Matthews divided the front building's upstairs unit into two separate units, for a building total of three units, after the March 2021 inspection.

{¶ 53} Next, appellant's arguments regarding insufficient notice of the violations are also belied by the record. The record contains numerous references to the many notices of violations—spanning back to 2011—that appellant received regarding the property. Appellant has never contested receiving the notices of violations, and indeed, the record contains evidence that appellant paid the penalties assessed due to the violations. Further, Mr. Matthews was present for the March 2021 inspection as well as several other inspections throughout the administrative appeal process. Appellant, represented by counsel, appeared before appellee on four occasions, giving appellant the opportunity to present its own evidence and to contest the city's inspection findings. Most significantly, the September 2, 2021 document compiled by the city building officials provided a comprehensive list of violations along with the corresponding code sections.

{¶ 54} Moreover, appellant's argument that a notice of violation must be understandable by a layperson is not only legally unsupported but unreasonable. Code

20.

compliance in residential buildings is a complex subject that necessarily involves specialized knowledge. Indeed, much of the work to correct the violations was required to be permitted and performed by registered contractors.

{¶ 55} Finally, appellant's argument that appellee's failure to provide a comprehensive list of violations until September 2, 2021 left appellant with insufficient time to repair the issues by October 26, 2021 mischaracterizes appellee's actions. At no point did appellee set a deadline for completing repairs. Instead, appellee required appellant merely to provide an approved comprehensive rehabilitation plan, granting appellant several extensions throughout the administrative proceedings to do so, with a final deadline of its October 26, 2021 meeting.

{¶ 56} Beyond appellant's misstatements and mischaracterizations of the administrative record, appellant has not set forth a legal basis for these two assignments of error. Appellant correctly articulated the trial court's standard of review—the trial court must affirm an administrative order unless it finds the order to be "unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record"—but appellant has not identified on which of these bases the trial court should have reversed. Nor has appellant cited any legal authority, other than to point to the Sandusky Codified Ordinance section governing the content of notices of violations, in support of these two assignments of error. Appellate courts "are not obligated to … formulate legal arguments on behalf of

21.

the parties." *Risner v. Ohio Dept. of Nat. Res., Ohio Div. of Wildlife*, 2015-Ohio-3731, ¶ 28.

{¶ 57} Accordingly, we hold that the trial court did not abuse its discretion in failing to find appellee's order was "arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record" and affirming appellee's demolition order, and appellant's first and second assignments of error are found not well-taken.

## B. Due Process

{¶ 58} In its third assignment of error, appellant claims that appellee failed to give appropriate notice and an opportunity to be heard, thus violating appellant's constitutional right to due process. Appellee argues that appellant received appropriate notice and had ample opportunities to be heard.

{¶ 59} The "'essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Stewart v. Lockland School Dist. Bd. of Edn.*, 2015-Ohio-3839, ¶ 11, quoting *Cleveland Bd. of Edn. v. Loudermill*, 470 U.S. 532, 542 (1985). The demolition of a privately owned building may constitute the taking of property. *See Toledo v. Schmiedebusch*, 2011-Ohio-284, ¶ 67. Accordingly, before appellant could be deprived of its property through a demolition order, appellant was entitled to notice and an opportunity for hearing. *Id*.

22.

{¶ 60} Actual notice of a demolition order is sufficient to satisfy the notice requirement of due process. *Carter v. Akron Hous. Appeals Bd.*, 2006-Ohio-392, ¶ 19 (9th Dist.). Further, "'[i]t is the responsibility of the property owner to be cognizant of the property he owns' in the face of repeated inspections and numerous violations of the [building code]." *McMaster v. Akron Health Dept., Hous. Div.*, 2010-Ohio-3851, ¶ 15 (9th Dist.), quoting *Carter* at ¶ 19. If a property owner "was afforded ample notice of the demolition hearing, had an opportunity to have a reinspection of [the property] to challenge the existing violations, and was present and testified at the demolition hearing," then the property owner's right to due process was not violated. *Id.* at ¶ 17.

{¶ 61} Here, as previously discussed, appellant was present at several inspections, received several notices of violation, was given a comprehensive list of violations, and appeared—represented by counsel—at four meetings before appellee during which Mr. Matthews was permitted to testify and present evidence. Accordingly, appellant has not established that the trial court abused its discretion by failing to find that its due process rights were violated, and appellant's third assignment of error is found not well-taken.

## C. Equal Protection

{¶ 62} In its last assignment of error, appellant claims that appellee's decision violated its right to equal protection. In support, appellant quotes the standard for selective or discriminatory prosecution as set forth in *State v. Flynt*, 63 Ohio St.2d 132, 134 (1980), which requires appellant to establish that it has been singled out for

prosecution while others who are similarly situated have not been selected for prosecution, and this was done due to impermissible considerations, such as race.

{¶ 63} In its brief, appellant identifies two specific properties, 1409 Columbus Avenue and 216 Decatur Street, that it claims also have lead-based issues but are owned by individuals who are white and have not been subjected to the same "violation notices, fines, demand of financial statements, and demolition" as appellant. Appellant has also suggested that the board has treated properties belonging to Donald Waddington, Jr. and Farrar Spencer differently.

{¶ 64} However, as appellee points out, appellant never presented this argument during the administrative proceedings. "Issues which were not raised at the administrative level are waived in the appeal to the court." *Herubin v. Ohio Dept. of Job & Family Services*, 2022-Ohio-3243, ¶ 48 (7th Dist.), citing *Stores Realty Co. v. City of Cleveland, Bd. of Bldg. Standards & Bldg. Appeals*, 41 Ohio St.2d 41, 43 (1975). Mr. Matthews, in an offhand remark at one meeting, speculated that a city building official either had something personal against him or did not like him because of his race. Mr. Matthews did not make any such allegations regarding any member of the Sandusky Housing Appeals Board or assert that appellee's requirement for a comprehensive rehabilitation plan was imposed because of the Matthews' race. Further, appellant did not make any statements or present any evidence regarding appellee's treatment of other property owners. Appellant also never mentioned the properties at 1409 Columbus Avenue and 216 Decatur Street during the appeal before appellee. Accordingly,

24.

appellant waived its right to assert an equal-protection claim on subsequent appeal, and its fourth assignment of error is found not well-taken.

## IV. Conclusion

{¶ 65} Appellant's assignments of error are overruled. We affirm the June 6, 2023 order of the Erie County Common Pleas Court. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J. _____

_____
Christine E. Mayle, J. _____ JUDGE

_____
Gene A. Zmuda, J. _____ JUDGE
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.